IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| ) | |
| vs. ) | 2:05-CR-139-A |
| ) | [WO] |
| CORY JERMICHAEL REED ) | |
| ) | |

### RECOMMENDATION OF THE MAGISTRATE JUDGE

Indicted for narcotics and firearm offenses,[1] Defendant Cory Jermichael Reed ("Reed") seeks to suppress cocaine seized in a warrantless search of his vehicle; firearms, cocaine, and other evidence seized in a warrant search of his residence; and oral statements following his arrest. Following an evidentiary hearing on September 16, 2005, and due consideration of all submissions, the Magistrate Judge RECOMMENDS that the suppression motion be denied.

### I. FACTUAL FINDINGS

Montgomery Police Department ("MPD") Detective J. T. Conway ("Det. Conway"), assigned to the Narcotics Bureau of the Special Operations Division, provided both the affidavit in controversy and testimony at the evidentiary hearing.[2] The only other witness, Neill Thompson ("Agent Thompson"), a Special Agent with the Drug Enforcement Administration, participated in

---

[1]The *Indictment* filed May 25, 2005, charges in Count 1 that "on or about the 28th day of April, 2005, in Montgomery County...Alabama,...Reed, did knowingly and intentionally possess with intent to distribute a mixture and substance containing a detectible amount of cocaine hydrochloride...in violation of Title 21, United States Code, Section 841(a)(1)." Count 2, grounded on 18 U.S.C. § 924(c), alleges that Reed "knowingly used and carried a firearm during and in relation to, and possessed a firearm in furtherance of, a drug trafficking crime" referenced in the first Count.

[2]*Def.'s Ex. 1* consists of the Search Warrant issued by Municipal Court Judge W. Troy Massey and the underlying affidavit of Det. Conway, each dated April 28, 2005.

the surveillance of Reed's residence and its subsequent search.[3]

### *Affidavit and Search Warrant*

On the morning of April 28, 2005, Det. Conway visited Judge Massey's Carmichael Road office in Montgomery to present his affidavit setting forth these averments of probable cause for a warrant to search Reed's residence:

> On February 10, 2004, Corey Reed AKA C-Murder showed a confidential and reliable informant hereinafter referred to as "A", a 1/4 kilogram of cocaine and $20,000.00 in U.S. Currency. This meeting was at a studio located at the corner of Ann Street and Third Street, Montgomery, Alabama.
>
> During the month of April 2005 a confidential and reliable informant, hereinafter referred to as "B", advised Corporal J.T. Conway that C-Murder was distributing large quantities of cocaine from 40 Fairlane Drive, Montgomery, Alabama.
>
> The same "B" advised that C-Murder is being supplied cocaine by a black male known only as AKA Bam-Bam. The informant advised that Bam-Bam lives in Atlanta and delivers cocaine to Montgomery, Alabama.
>
> The "B" advised Corporal Conway that on April 28, 2005, Bam-Bam was going to deliver a quantity of cocaine to C-Murder. The informant advised that the cocaine was going to be delivered to 40 Fairlane Drive, Montgomery, Alabama.

On April 28, 2005, "B" informant called Corporal Conway and advised that he/she had just left 40 Fairlane Drive, Montgomery, Alabama and that he/she did not know how much cocaine was there but that it was more than 2 kilograms of cocaine. The informant advised that the cocaine was packaged in zip-lock bags.[4]

Det. Conway deemed both Informant "A" and Informant "B" reliable because both had "provided information to the Montgomery Police Department's Special Operations Division in numerous cases" and their assistance resulted in both "the seizure of Cocaine, Marijuana, Weapons

---

[3]*Def.'s Ex. 2* comprises three pages of Agent Thompson's investigative report prepared on May 2, 2005.

[4]*Def.'s Ex. 1. See also* Tr. 7-10, 15. Det. Conway testified that Informant "B" also told him that "he saw handguns in the house". (Tr. 7).

and U.S. Currency" and "several arrest warrants and search warrants served".[5]

Judge Massey issued a warrant to "search...the premises of 40 Fairlane Drive, Montgomery, Alabama, and any vehicles and outbuildings at the residence."[6] The warrant did not specify the time of issuance, but Det. Conway went to his vehicle promptly for a phoned report to Agent Thompson that he had the warrant in hand.

### *Surveillance of Reed's Residence*

"Earlier in the week or a few days" prior to April 28, Det. Conway shared with Agent Thompson investigative details implicating Reed in narcotics dealings and secured his assistance to verify Reed's residence at 40 Fairlane Drive through utility records and personal surveillance. Around 8:00 a.m. on April 28, Agent Thompson and other narcotics agents, including Intelligence Analyst Andy Cotton established surveillance at Reed's residence while Conway pursued the search warrant.

"[P]robably three to five minutes" after being advised of the signed search warrant, around 9:50 a.m., Agent Thompson saw Reed and Darrell Hayes ("Hayes") exit the residence through a garage door, open a gate on the privacy fence, and enter a Chevrolet Tahoe which Reed backed out into the driveway; after stopping to close the gate, the men left the premises. "[A]t least five minutes" passed from Agent Thompson's first sighting of the men leaving the house until their departure in the Tahoe, and he posted the surveillance team on his observations.[7] While Agent

---

[5]*Def.'s Ex. 1*. Det. Conway testified that he could provide "the names of actual arrest warrants that would be on file, so that the Court could independently check the validity of what [he] was saying about these particular informants."(Tr. 31).

[6]*Def.'s Ex. 1*.

[7]*Def.'s Ex. 2*; Tr. 37-38.

Thompson maintained his position at the residence, Task Force Officer Joe Herman ("TFO Herman") followed the Tahoe, and Det. Conway "call[ed] for a MPD marked police car to stop the vehicle."[8]

### *Stop and Search of Vehicle*

MPD officers stopped the Tahoe around 10:00 a.m., at the BP gas station on the Southern Boulevard near Montgomery Mall, more than a mile from Reed's residence; Det. Conway arrived shortly thereafter.[9] Officers advised Reed of the search warrant for his residence and uncovered $2,590.00 in cash from his pat-down frisk  A similar frisk of Hayes produced a small plastic bag of suspected cocaine from his pants pocket. After a trained narcotics detection dog alerted on the center console of the Tahoe, Det. Conway searched and seized approximately four and one half ounces of suspected cocaine. Officers transported the men back to Reed's residence.[10]

### *Search of Residence; Arrest and Statements*

After securing a lone occupant from the house, officers began executing the search warrant at approximately 10:30 a.m., and their inventoried seizures included cocaine, digital scales, handguns, and ammunition.[11] Following his arrest and advice of *Miranda* rights by Det. Conway, in the presence of Agent Thompson, Reed responded to Agent Thompson's questions in the absence of any signed form documenting his waiver of *Miranda* rights. He admitted purchasing at a gun show the Taurus .45 caliber handgun seized from his house and also reported his involvement in

---

[8] Tr.12, 39; *Def.'s Ex. 2* at ¶5.

[9] Tr. 23-24; *Def.'s Ex. 2* at ¶5.

[10] *Def.'s Ex. 2* at ¶¶ 5-8; Tr. 12-13.

[11] Tr. 13, 39.

an unrelated domestic disturbance. Interrogation ceased when Reed signaled his unwillingness to continue.[12]

## II. DISCUSSION

Reed challenges *first* the sufficiency of probable cause to stop and conduct a "warrantless search" of the Tahoe since he "had committed no traffic crime...[and] no citation was ever issued for any violation." Reed disputes next the sufficiency of the probable cause underlying the search warrant for his residence.[13]  The United States responds that the presence of the Tahoe at the residence when the warrant issued subjected it to the warrant's authorization for a search of "all vehicles...at the residence." If not encompassed by the valid search warrant, the United States contends, seizures from the Tahoe should be admitted because "Detective Conway had a good faith to believe that [the warrant] did [cover the Tahoe], thus he was authorized to search the vehicle."[14] These contentions necessarily warrant an initial analysis of the search warrant before proceeding to the warrantless stop and search of Reed's vehicle and his post-arrest statements.

### A.     "Probable Cause" Adequacy of Search Warrant

####             *1.  Analytical Standards*

Well-established standards govern evaluation of the probable cause averments in Det. Conway's affidavit. "A substantial basis for probable cause exists where the totality of the circumstances set forth in the affidavit provides sufficient information for a magistrate to determine that 'there is a fair probability that contraband or evidence of a crime will be found in a particular

---

[12]Tr. 13, 41-42.

[13]*Mot.* at ¶¶3-4.

[14]Response to Motion to Suppress at ¶7 ("*Gov't Resp.*")(Doc. 38, filed Sept. 12, 2005).

5

place.' " *United States v. Gonzalez*, 940 F.2d 1413, 1419 (11th Cir.1991), *quoting in part Illinois v. Gates,* 462 U.S. 213, 238-39 (1983). "[O]nly the probability, and not a *prima facie* showing, of criminal activity is the standard of probable cause." *Illinois v Gates*, 462 U.S. at 235 (*citations omitted*).

Insofar as "[p]robable cause is a fluid concept – turning on the assessment of probabilities in particular factual contexts – not readily, or even usefully, reduced to a neat set of legal rules," *Id.* at 232, "[t]he task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying the hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. . . And the duty of the reviewing court is simply to ensure that the magistrate had a 'substantial basis for...concluding' that probable cause existed." *Id.* at 238. Thus, the Supreme Court cautions that reviewing courts "should not interpret supporting affidavits in a hyper-technical manner, rather a realistic and common sense approach should be employed so as to encourage recourse to the warrant process and to promote the high level of deference traditionally given to magistrates in their probable cause determinations." *Id.* at 236-237.

### 2. *Evidentiary Analysis*

Reed alleges two probable-cause deficiencies in Det. Conway's affidavit: his "knowing" use of "stale" information from Informant "A " in February 2004 and the unreliability of Informant "B", who gave tips in April 2005.[15] Disputing both allegations, the United States emphasizes that A's

---

[15]Seeking to discredit any "update" through tips by Informant "B" of the information supplied by Informant "A", Reed dismisses the former as "the word of a drug addict who likely has
(continued...)

information "provided little more than background information for Judge Massey [ since the] primary source of the information leading to the search warrant was from [Informant] B" whose reliability is documented by previous tips resulting in the MPD's seizure of contraband and the execution of several search and arrest warrants.[16]

The United States' assessment is correct. The fact is that Informant "A" did not report cocaine distributions inside Reed's residence[17]; Informant "B" did and thereby supplied the "fair probability" that a search would uncover "controlled substances, controlled substance paraphernalia, drug related documents, monies, and drug records." The affidavit recited specific facts lending credence to B's report: the race, gender, and residence of the supplier who personally delivered cocaine to Reed; the supplier's scheduled delivery of cocaine to the residence of April 28; and not insignificantly, the informant's just-concluded visit that same day inside Reed's house, where he personally observed "more than 2 kilograms of cocaine .. packaged in zip-lock bags." An informant is "unlikely to be untruthful" when his "report consisted of facts readily verifiable upon a subsequent search by the police ... for, if the warrant issued, lies would likely be discovered in short order and favors falsely curried would dissipate rapidly." *United States v. Foree*, 43 F. 3d 1572, 1576 (11th Cir. 1995). Informant B's first-hand observations of cocaine inside Reed's residence, reported in the

---

[15](...continued)
significant legal problems with prior drug involvement" and "[s]uch information is not of the character that the courts should use to corroborate 'stale' evidence in issuing search warrants." *Mot.* at ¶15.

[16]*Gov't Resp.* at ¶ 7.

[17]According to both the affidavit and Det. Conway's testimony, Informant "A" provided information about Reed's possession of cocaine and cash at another location in Montgomery, Alabama. *Def.'s Ex. 1*; *see also* Tr. 7-9.

affidavit prepared contemporaneously by Det. Conway, buttressed his credibility.[18]

Reed fails altogether to demonstrate evidentiary support for his "reliability" attack on Informant "B" and the record discloses none. Both Det. Conway's affidavit and his testimony specify the informants' previous assistance resulting in the seizure of cocaine, marijuana, weapons, and illegal currency as well as the service of several arrest warrants and search warrants. Reed declined Det. Conway's offer to identify past cases in which these informants provided assistance that proved reliable and truthful.[19] Accordingly, the court concludes from the totality of circumstances that sufficient probable cause supports the search warrant.

### B.  Warrantless Stop and Search of Vehicle

Three undisputed evidentiary facts guide the analysis of the warrantless stop and search of Reed's Tahoe before execution of the search warrant at his house: (1) the warrant authorized the search of "any vehicles...at the residence;" (2) after notice of the signing of a search warrant for the house, officers monitoring the house observed Reed driving the Tahoe from its parked place in the backyard of the residence; (3) officers stopped and searched the Tahoe away from the residence and in the absence of any traffic violation by Reed or any warrant for his arrest.

In reliance on *Terry v. Ohio*, 392 U.S. 1 (1968) and its progeny, Reed argues the lack of

---

[18] *See United States v. Bervaldi*, 226 F. 3d 1256, 1264 (11th Cir. 2000) (discussing staleness doctrine)." Regarding Reed's complaint that the affidavit failed to aver the truthfulness or corroboration of the informant's reports, independent police corroboration for an informant's tip is not a requirement in every case. *See United States v. Brundidge*, 170 F. 3d 1350, 1353 (11th Cir. 1999); *see also United States v. Roland*, No. 04-10941, 2005 U.S. App. LEXIS 10293, at **3-4 (11th Cir. May 31, 2005).

[19] Tr. 31.

probable cause for the initial stop of his car in traffic and the resulting detention, search, and seizures. In opposition, the United States places primary emphasis on the presence of Reed's Tahoe at his house when the search warrant issued to authorize a search not only of the house but also of vehicles *at the residence;* moreover, the United States contends that *United States v. Leon, 468 U.S. 897 (1984)* should serve to validate Det. Conway's good-faith belief that the search warrant contemplated a search of the vehicle under these facts.

This court finds an appropriate starting point for its analysis in the Eleventh Circuit's recent though unreported decision on analogous facts in *United States v. Sears*, No. 04-13286, 2005 WL 1427509 (11th Cir. June 20, 2005). Sheriff's officers were conducting a surveillance and preparing to search Sears' house pursuant to a warrant which authorized "a search not only of the house and its contents but also the people connected therewith and of all vehicles within the curtilage." Before executing the search warrant, they saw Sears walk outside his house and speak with an arriving motorist "who handed him a white plastic bag that was weighed down with brick-like objects." Half an hour after returning inside, Sears re-emerged, "got into his car, and began to drive away." An officer stopped Sears "approximately 100 feet from his house", reported the imminent execution of the search warrant for narcotics at his house, and secured his cooperation to gain entry into the house as well as unsolicited incriminating statements.

In affirming the trial court's rejection of Sears' argument "that the officers lacked reasonable suspicion to stop his car and that all subsequently discovered evidence was fruit of the poisonous tree", the appellate panel reasoned:

> Sears argues that he was seized in violation of the Fourth Amendment because the officers who stopped his car lacked probable cause to do so. This argument misses the mark. Because the officers had a valid warrant to search Sears' home, they had a basis to detain him during the search. *See Michigan v. Summers*, 452 U.S. 692, 705

>(1981) ("[A] warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted."). Whether the officers had probable cause to pull Sears over independently of the search warrant is irrelevant.
>
>[N]o constitutional violation occurs when officers who are preparing to serve a valid search warrant stop and detain an individual who is in the process of leaving the premises to be searched. That the stop does not occur on the premises to be searched is irrelevant so long as the officers detain the individual as soon as practicable after his departure

*Sears*, 2005 WL 1427509, at **3.[20]

Unquestionably, narcotics officers were preparing to execute at Reed's house the valid search warrant secured by Det. Conway, who, upon notice of Reed's departure, promptly summoned an MPD unit "in hopes of stopping the Tahoe before it left the yard." However, Reed "left,...drove down Fairlane and got out onto the Boulevard before [the officers] could get him stopped."[21] The evidentiary record supports a finding that the officers stopped Reed in his car as soon as practicable after he departed his house, and given the valid search warrant for its search, *Michigan v. Summers* affirms the legality of the stop intended to keep him at the premises during the search.

Having confirmed the constitutional propriety of the stop, the analysis turns to whether officers infringed Reed's Fourth Amendment rights in frisking him and using a trained narcotics detection dog to sniff the vehicle. They did not. *See Terry v. Ohio* (discussing police authority for

---

[20] The court found persuasive the Sixth Circuit's opinion in *United States v. Cochran*, 939 F. 2d 337 (6th Cir. 1991); there, "police officers were preparing to execute a search warrant at the defendant's home when the defendant got into his car and drove away." *Id.* at 338. Officers stopped his car and secured his assistance to enter the home. Citing Michigan v. Summers, the Sixth Circuit found the detention proper even though it occurred a short distance from the defendant's home. *Sears*, 2005 WL 1427509, at **3.

[21] Tr. 12.

investigatory search of individual upon reasonable suspicion of criminal activity); *United States v. Hensley*, 469 U.S. 221, 235 (1985) (authorizing officers making traffic stop to "take such steps as are reasonably necessary to protect their personal safety"); *Pennsylvania v. Mimms*, 434 U.S. 106, 111-112 (1977) (discussing authority for protective search of driver).

Nor did officers contravene the Fourth Amendment after frisking Reed by using an on-site narcotics detection dog for an exterior sniff, and in response to the dog's alert, proceeding to search inside and seizing the contraband in controversy. *See Illinois v. Caballes*, 125 S.Ct. 834, 837-847(2005). After duly considering the totality of circumstances surrounding the stop of Reed's car and his brief detention for a patdown frisk, canine sniff and associated search of the vehicle, before officers transported him home for the authorized warrant search, the court finds no constitutional impropriety.

### C. Post-Arrest Statements

Reed's contention for suppression of his post-arrest statements rests solely on the absence of a "Miranda rights form signed by [him]" to document officers' testimony to that effect.[22] The contention merits short shrift on a record which presents no basis at all for discrediting the officers' testimony of the *Miranda* explanation and his subsequent voluntary waiver. Indeed, Reed offers no legal authority for the implication that the absence of a signed waiver form is fatal[23], no argument

---

[22]*Mot*. at ¶ 16; *see Miranda v. Arizona*, 384 U.S. 436, 467-72 (1966) and *Moran v. Burbine*, 412 U.S. 412 (1986) (explaining inquiry to assess voluntary, knowing, and intelligent waiver of *Miranda* rights).

[23]*See United States v. Boon San Chong,* 829 F.2d 1572, 1574 (11th Cir.1987) ("In the absence of an express waiver, a waiver of rights can be implied from the actions and words of the person (continued...)

premised on voluntariness,[24] and his relevant cross-examination at the evidentiary hearing yielded no probative challenge.[25]

### III. CONCLUSION

Pursuant to the foregoing findings of fact and legal conclusions, it is the RECOMMENDATION OF THE MAGISTRATE JUDGE that the *Motion to Suppress* (Doc. 18, filed June 30, 2004) be **DENIED**.

It is further **ORDERED** that the parties shall file any objections to the said Recommendation not later than November 17, 2005. Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation to which the party is objecting. Frivolous, conclusive or general objections will not be considered by the District Court. The parties are advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.

---

[23](...continued)
being questioned. For example, if after being advised of his rights an individual responds willingly to questions without requesting an attorney, waiver may be implied."); *Moran v. Burbine,* 475 U.S. 421, 427 (1986) ("[F]ull comprehension of the rights to remain silent and request an attorney [is] sufficient to dispel whatever coercion is inherent in the interrogation process.").

[24]Reed's entire argument on this contention states:

> The discovery information claimed that the defendant was advised of his rights when taken into custody and that he made statements. However, the discovery does not contain any documents Miranda Rights form signed by defendant Reed. This substantiates the defendant's position that he was not given his Fifth Amendment rights in this case.

*Mot.* at ¶ 16.

[25]Tr. 41-42.

Failure to file written objections to the proposed findings and advisements in the Magistrate Judge's Recommendation shall bar the party from a de novo determination by the District Court of issues covered in the Recommendation and shall bar the party from attacking on appeal factual findings in the Recommendation accepted or adopted by the District Court except upon grounds of plain error or manifest injustice. *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982); s*ee Stein v. Reynolds Securities, Inc*., 667 F.2d 33 (11th Cir. 1982); *see also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981, *en banc*)(adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981).

Done this 7th day of November, 2005.

/s/ **Delores R. Boyd**
DELORES R. BOYD
UNITED STATES MAGISTRATE JUDGE